**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-1855**

———————

KENNETH ROBINSON; CHRISTOPHER HALL,

        Plaintiffs - Appellants,

v.

PRIORITY AUTOMOTIVE HUNTERSVILLE, INC., d/b/a Priority Honda Huntersville; JAMES BECKLEY,

        Defendants - Appellees.

———————

On Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. David Shepardson Cayer, Magistrate Judge. (3:20-cv-00318-DSC)

———————

Argued: October 27, 2022                    Decided: June 15, 2023

———————

Before NIEMEYER and RICHARDSON, Circuit Judges, and Michael S. NACHMANOFF, United States District Judge for the Eastern District of Virginia, sitting by designation.

———————

Affirmed in part, vacated in part, and remanded by published opinion. Judge Richardson wrote the opinion, in which Judge Niemeyer and Judge Nachmanoff joined.

———————

**ARGUED:** Alesha S. Brown, JUSTICE IN ACTION LAW CENTER, Charlotte, North Carolina, for Appellants. King Fitchett Tower, WOODS ROGERS VANDEVENTER BLACK PLC, Roanoke, Virginia, for Appellees. **ON BRIEF:** Michael P. Gardner, Leah M. Stiegler, Elaine D. McCafferty, WOODS ROGERS VANDEVENTER BLACK PLC, Roanoke, Virginia, for Appellee Priority Automotive Huntersville, Inc. Philip J. Gibbons,

Jr., Corey M. Stanton, GIBBONS LEIS, PLLC, Charlotte, North Carolina, for Appellee James Beckley.

_____

RICHARDSON, Circuit Judge:

Not long after getting a new boss at the Priority Automotive Honda dealership, Kenneth Robinson and Christopher Hall effectively resigned from their jobs. They then sued, alleging racial discrimination—claiming that the new boss and the company fostered a hostile work environment and demoted them because they are Black—along with various state torts. Robinson and Hall lost at summary judgment and appealed. We largely affirm but remand their state-law conversion claims for further proceedings.

## I.      Background

James Beckley's first days as the new boss at Priority Automotive were frenetic. He was fresh off a stint managing a different car dealership and brought a troop of employees with him. He quickly implemented operational and structural change. He re-organized the dealership's departments and functions, demolished an internal wall, and cleaned the entire facility.

Beckley's overhaul included relocating where car sales were finalized. Under the prior regime, sales associates congregated at the front of the store while sales managers were located down a side hallway. Associates would initially interact with customers out front, but then would leave them to finalize deals with the managers down the hall. Beckley thought it would be more efficient and welcoming to finalize deals in the middle of the store at a "sales tower." So he directed the sales managers to set up there, centralizing sales operations.

Robinson and Hall were both sales managers. Unlike the other managers, Robinson and Hall did not relocate to the "sales tower." The others, who each relocated, continued

3

to receive deals from the sales associates. But, although no one told them not to move, Robinson and Hall both decided to stay put. Sales associates stopped bringing them deals, which was bad for Robinson and Hall, as their pay was tied to their sales.

Robinson and Hall, who are both Black, allege that they experienced racial discrimination during Beckley's first week as their new boss. When he started, Beckley gave a speech in which he told the sales staff that he wanted to "make Priority Honda great again." J.A. 129–31. Robinson and Hall say that paraphrasing President Trump's campaign slogan is racist and discriminatory toward minority employees. They also claim that Beckley told another employee, Kyle Vasquez, to "stop hanging around with those thugs"—allegedly referencing a mixed-race group that included Robinson and Hall—"and start hanging around sales managers." J.A. 709. Moreover, they allege that their fellow employee, Lolli Cornelius, was overheard telling another employee, Bill Anderson, to "come over to the white side."[1] J.A. 165. And they assert that the reason they stopped receiving deals from sales associates was that they are Black.

On the heels of these events, and on Beckley's fifth day, Plaintiffs filed multiple racial-discrimination complaints with Diane Ulmer, Priority Automotive's Controller. They then left work. Ulmer contacted corporate human resources and began investigating.

---

[1] What Cornelius truly said is hotly disputed. Wallah Richardson—the employee who told Robinson about the incident—testified that he told Robinson that Cornelius said "right side," not "white side." J.A. 339. He calls Robinson's assertion to the contrary "misinformation" and says that he feels "used" by Robinson. J.A. 340. And while Hall seemingly testified that he personally overheard "white side," Cornelius herself says that she said "right side." J.A. 539–40. But, given the case's posture, we assume that the comment was what Plaintiffs allege.

4

She tried to facilitate a meeting between Beckley, Robinson, and Hall to resolve what she viewed as a misunderstanding. Hall rebuffed these efforts and never returned to the dealership. But Robinson did return and met with Beckley. And they made some headway. Robinson says that Beckley apologized "sincere[ly]" for the "make Priority Honda great again" and "thugs" comments. Yet when Beckley presented Robinson with a new pay plan that effectively demoted him to sales associate, Robinson refused to sign it. By doing so, Robinson knowingly triggered his own termination.[2]

## II.     Standard of Review

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It should be granted only "if a reasonable jury could [not] return a verdict for the nonmoving party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (cleaned up). This means that we cannot weigh evidence and must draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* at 659–60. But it also means that plaintiffs need to present more than their own unsupported speculation and conclusory allegations to survive. *See Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).

## III.     Discussion

Robinson and Hall brought various state and federal claims. They sued Priority Automotive under both Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*, and

---

[2] At Priority Automotive, sales employees sign new pay plans every month. Priority Automotive's policy is to treat a refusal to sign a new pay plan as a resignation.

42 U.S.C. § 1981, alleging a hostile work environment and disparate treatment. And they brought a wide swath of North Carolina state-law claims against both defendants, including: an intentional-infliction-of-emotional-distress claim against Priority Automotive and Beckley; a negligent-hiring claim against Priority Automotive; and a conversion claim against Priority Automotive and Beckley.

The parties agreed to have a magistrate judge decide their case. He awarded summary judgment to Defendants on all claims. Plaintiffs appealed.[3] We affirm, except for the state-law conversion claim. On that claim, we vacate and remand for further proceedings.

### A.      Hostile Work Environment

We start with Plaintiffs' hostile-work-environment claim under Title VII and § 1981. Title VII makes it unlawful for an employer to "discriminate against any individual with respect to [ ] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Since the statute references the "terms, conditions, or privileges of employment," courts read it to reach beyond "'economic' or 'tangible'" discrimination, to forbid subjecting an employee to a hostile work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is

---

[3] Because both parties consented to his jurisdiction, direct appeal of the magistrate judge's order is proper under 28 U.S.C. § 636(c)(3).

enjoyed by white citizens." 42 U.S.C. § 1981. Like Title VII, § 1981 outlaws racially hostile work environments. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc).

A hostile work environment exists only when the workplace is so "permeated with 'discriminatory intimidation, ridicule, and insult,'" that it "would reasonably be perceived, and is perceived, as hostile or abusive." *See Harris*, 510 U.S. at 21, 22 (quoting *Meritor*, 477 U.S. at 65). We apply a four-part test to see if this standard is met. First, the employee must experience unwelcome harassment. *Boyer-Liberto*, 786 F.3d at 277. Second, in a race-discrimination claim, the harassment must be because of the employee's race. *See id.* Third, the harassment must be so "severe or pervasive" that it alters the conditions of their employment and creates an abusive atmosphere. *Id.* Lastly, the harassment must be imputable to their employer.[4] *Id.* "While the first element is subjective, the rest of the test is made up of objective components based on a 'reasonable person' standard." *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009).

Much of the allegedly harassing conduct does not make it past step two: a reasonable person could not find—based on the record—that it occurred *because* Plaintiffs are Black. Start with the purported drop-off in Plaintiffs' sales. Robinson and Hall claim

---

[4] Ordinarily, we do not impute harassment to an employer if he exercised reasonable care in preventing and correcting it. *See Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 232–34 (4th Cir. 2022); *Boyer-Liberto,* 786 F.3d at 278. But if a supervisor subjects their employee to a hostile environment so severe that the employee is constructively discharged, then imputation is automatic. *See Boyer-Liberto,* 786 F.3d at 278. Since we find that Plaintiffs have not established severe or pervasive racial harassment in the first place, we need not address imputation.

7

that Beckley told sales associates not to bring the two of them deals, and did so because they are both Black. But Plaintiffs have no personal knowledge or other evidence showing this. Plaintiffs' sales woes could just as easily have an innocuous explanation: Robinson and Hall chose not to relocate to the "sales tower" with the rest of the managers. There is, in fact, ample record evidence suggesting that Plaintiffs stopped receiving deals because they did not relocate to the new sales location. And Plaintiffs do not allege that anyone told them to stay put. Indeed, Robinson himself admits that no one advised him that he stopped receiving sales because of his race. He says it was "just regular work stuff" that he interpreted as discriminatory. J.A. 91. So Plaintiffs support their claim with only their belief. Yet, without evidence, a reasonable person could not conclude that Plaintiffs' drop-off in sales was because they are Black. *See McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 409 (4th Cir. 2022) (explaining that plaintiff's own conjecture cannot "impute a racial character to what appears to be neutral" behavior).

The same is true for Beckley's use of "thugs." "Thugs" is a derogatory term and its use supports Plaintiffs' allegation that they experienced unwelcome harassment. *See Thug*, Webster's New World College Dictionary 1512 (2014) ("a cheat . . . a rough, brutal hoodlum . . ."). But establishing subjective, unwelcome harassment is not enough. Plaintiffs must also support a reasonable inference they experienced a *racially* hostile environment.

8

Some believe that "thugs" is racially charged when directed at Black individuals.[5] Yet "thugs" is often used non-racially to express disapproval of group behavior. For example, the last three U.S. presidents have used the term to refer to non-Black people and mixed-race groups.[6] Race is thus not always the reason a person uses "thugs." And there is nothing in the record, beyond Plaintiffs' unsupported belief, suggesting that their race was the reason here. *See McIver*, 42 F.4th at 409. The comment was directed at a group— not at Plaintiffs in particular—that included non-Black employees. So whether or not it would violate someone's subjective sensibilities or defy etiquette ideals, Beckley's one-time use of "thugs" fails to support an objective inference of racial harassment—never mind severe or pervasive racial harassment. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) ("[T]he statement is not discriminatory on its face, as it

---

[5] *See, e.g.*, John McWhorter, *Baltimore's Mayor and the President said 'Thugs'? Let's Not Get Too Bent Out of Shape*, WASH. POST (May 1, 2015), https://www.washingtonpost.com/posteverything/wp/2015/05/01/baltimores-mayor-and-president-obama-said-thugs-lets-not-get-too-bent-out-of-shape/ [https://perma.cc/4999-9RTH].

[6] *See* Lauren Gambino, *Biden Decries Trump Mob*, GUARDIAN (Jan 7, 2021), https://www.theguardian.com/us-news/2021/jan/07/joe-biden-trump-mob-domestic-terrorists [https://perma.cc/29UK-KXUR] (Biden referring to "the mob of thugs that stormed the Capitol."); Maureen Breslin, *Biden Says Putin is a 'Murderous Dictator'*, HILL (March 17, 2022), https://thehill.com/policy/international/russia/598660-biden-says-putin-is-a-murderous-dictator/ [https://perma.cc/PT7T-ZUAX] (Biden calling Vladimir Putin a "pure thug"); *Trump Says People Protesting in Washington Thursday were 'Thugs'*, REUTERS, (Aug. 28, 2020), https://www.reuters.com/article/us-usa-washington-trump-thugs/trump-says-people-protesting-in-washington-thursday-were-thugs-idUSKBN25O359 [https://perma.cc/52F8-LXPR] (Trump calling protesters "thugs"); David Jackson, *Obama Stands by the Term 'Thugs,' White House Says*, USA TODAY (Apr. 29, 2015), https://www.usatoday.com/story/theoval/2015/04/29/obama-white-house-baltimore-stephanie-rawlings-blake/26585143/ [https://perma.cc/LB2M-KAGS] (Obama discussing "criminals and thugs" who destroyed property in Baltimore).

could have been made in reference to any . . . employee . . . Nor is it placed in any context that makes it so.").

Likewise, there is nothing to suggest to a reasonable person that Beckley said he wanted to "make Priority Honda great again" because Plaintiffs are Black. Paraphrasing this campaign slogan is not objectively racist. And Plaintiffs' subjective discomfort—whether based on possible political preferences or on perceived animus—is not grounds for a federal racial discrimination claim.

That said, a reasonable person might conclude that Cornelius's alleged "white side" comment, *see*, *supra*, n.1, was race-based harassment. But the statement, on its own, does not create a *severe or pervasive* hostile work environment. Even the "utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" is generally not severe or pervasive enough to create a hostile work environment. *Vinson*, 477 U.S. at 65. And a peer's offensive conduct is less weighty in our analysis than a supervisor's actions. *See Boyer-Liberto*, 786 F.3d at 278. So the isolated instance of Cornelius—Plaintiffs' peer—allegedly saying, "come over to the white side" to another employee does not constitute "severe or pervasive" racial harassment. *See McIver*, 42 F.4th 407 (finding no "severe or pervasive" harassment based on discrete instances because "a hostile-work-environment claim's 'very nature involves repeated conduct'" (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002))). With no other alleged harassing conduct to rely on, Plaintiffs' hostile-work-environment claim fails.

10

## B.    Disparate Treatment

Robinson also alleges that Priority Automotive violated Title VII and § 1981 by demoting him because of his race.[7]  To survive summary judgment, Robinson must raise a dispute of material fact as to whether he was demoted because he is Black.  He can do this either with direct evidence or by developing "an inferential case of discriminatory intent." *Lyons v. City of Alexandria*, 35 F.4th 285, 289 (4th Cir. 2022); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

Since Robinson has not proffered any direct evidence of intentional discrimination, he can prevail only under an inferential approach.  Under that approach, he must first establish a prima facie case.  *Lyons*, 35 F.4th at 289.  As one element of that case, he must show that his demotion occurred under circumstances that support a reasonable inference of unlawful racial discrimination.  *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–50 (4th Cir. 2021).  To meet this element, a plaintiff could—for instance—show that the employer left his position open, *see, e.g.*, *McDonnell Douglas*, 411 U.S. at 802, or that the employer filled it with someone outside the protected class,  *see, e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Miles v. Dell, Inc.*, 429 F.3d 480, 486 (4th Cir. 2005) ("[A]s a general rule, Title VII plaintiffs must show that they were replaced by someone outside their protected class in order to make out a prima facie case.").

---

[7] Hall makes the same allegation.  But his claim fails because he was never demoted. Robinson, in contrast, was demoted when he was offered a new pay plan for a sales associate position.

11

But Robinson does neither. Instead, he points to Beckley's comments and actions as being the circumstances that support a reasonable inference of unlawful discrimination. In particular, he relies on Beckley's "thugs" comment, the "make Priority Honda great again" speech, and the drop off in his sales after Beckley's arrival. Robinson says that these three alleged facts show that Beckley is racist, and he invites us to thus infer that Beckley demoted him because he is Black.

Yet this conduct does not make that inference reasonable. *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999) (explaining that "stray or isolated" derogatory remarks are generally not sufficient evidence of unlawful intentional discrimination). Nothing about either the "thugs" or "make Priority Honda great again" comments was facially racially discriminatory, nor does anything about those comments' context change that conclusion. *See Evans*, 80 F.3d at 959. And, as we have said already, Robinson's "alleged understanding" about why he received fewer sales after Beckley's arrival does not reasonably suggest that the decline was race-based. *See Lyons*, 35 F.4th at 290. So, since Robinson fails to support a reasonable inference of unlawful intentional discrimination, the magistrate judge rightfully rejected his disparate-treatment claim.

## C.    Intentional Infliction of Emotional Distress

Plaintiffs each brought North Carolina intentional-infliction-of-emotional-distress claims against Beckley and Priority Automotive as well. To prevail, it is not enough for Plaintiffs to point to "rough language" or "occasional acts that are definitely inconsiderate or unkind." *Hogan v. Forsyth Country Club Co.*, 340 S.E.2d 116, 123 (N.C. Ct. App. 1986). Instead, Plaintiffs must show that Defendants engaged in "extreme and outrageous"

12

conduct that "exceeds all bounds of decency tolerated by society." *West v. King's Dep't Store, Inc.*, 365 S.E.2d 621, 625 (N.C. 1988) (standard met by store manager aggressively accusing woman he knew was ill of theft and threatening prosecution even though she had a receipt); *Turner v. Thomas*, 794 S.E.2d 439, 446 (N.C. 2016) (standard met by prosecutors who allegedly tried to frame plaintiff for murdering his wife); *Sargent v. Edwards*, 808 S.E.2d 927 (Table) (N.C. Ct. App. 2018) (standard not met by defendant who yelled obscenities at, and physically fought, plaintiff).

They have not. No reasonable jury could find that Defendants' alleged conduct "rise[s] to the level of 'outrageous and extreme' as the term has been interpreted and applied" in North Carolina. *See Guthrie v. Conroy*, 567 S.E.2d 403, 410 (N.C. Ct. App. 2002). Plaintiffs' intentional-infliction-of-emotional-distress claims thus fail.

### D.    Negligent Hiring

Plaintiffs also sued Priority Automotive claiming that it was negligent under North Carolina law for hiring Beckley. To succeed, Plaintiffs had to show that Beckley was incompetent when hired by presenting evidence of either his inherent unfitness for the position or a prior act of negligence from which Priority Automotive should have inferred his incompetency. *See Medlin v. Bass*, 398 S.E.2d 460, 462 (N.C. 1990).

They presented no such evidence. Plaintiffs argue that Beckley was incompetent because he "engaged in similar discriminatory and negligent behavior" at a prior job. Appellants' Opening Brief at 28. They support this allegation with only Hall's testimony that he "heard a couple of things" about why Beckley left his former job that Hall had not

13

"really dug into."[8]  J.A. 745–46.  But Hall's testimony is likely inadmissible hearsay and so improper for this Court to consider.  *See Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991).  It is also pure rumor and speculation that no reasonable jury could accept as showing incompetence.  So the magistrate judge correctly awarded summary judgment to Priority Automotive on this claim.

### E.    Conversion

Finally, Plaintiffs sued Priority Automotive and Beckley for conversion under North Carolina law.  "There are, in effect, two essential elements of a conversion claim: ownership in the plaintiff and wrongful possession or conversion by the defendant." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744, 747 (N.C. 2012).  Wrongful possession or conversion in this context means "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Id.* (quoting *Peed v. Burleson's, Inc.*, 94 S.E.2d 351, 353 (N.C. 1956)).

Plaintiffs allege that several items they own and kept at the dealership in their desks were thrown out by Beckley and other employees on his orders.  Hall says he heard Beckley announce he "threw all the desks out."  J.A. 744.  Robinson claims another employee told Robinson that Beckley ordered the desks emptied.  No party contests that Plaintiffs owned the items.  And while Beckley denies throwing out their property or ordering anyone else to do so, we cannot choose whom to believe without weighing the evidence.  The

---

[8] These "things" Hall "heard" included "racial charges" about "discriminating against employees and/or customers."  J.A. 746.

14

magistrate judge erred by doing so.  On the current record, a reasonable juror could find for Plaintiffs on their conversion claim.  We must thus vacate that part of the order.[9]

*          *          *

Courts do not weigh evidence when ruling on a motion for summary judgment.  So when both parties raise facts sufficient for a reasonable jury to find for them at trial, the claim must survive.  But discrimination claims need more than neutral facts, an adverse action, and speculation about discriminatory motives to make it past this stage.  Accordingly, the magistrate judge's judgment is

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED.*

---

[9] This dispute can be resolved on remand.  Or the court may consider whether it should continue to exercise subject-matter jurisdiction over this case since "all claims over which it had original jurisdiction" have been dismissed.  *See* 28 U.S.C. § 1367(c)(3).