**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 24-1568**

_____

TERRANCE REEVES,

        Plaintiff – Appellant,

    v.

PETE HEGSETH, Secretary, U.S. Department of Defense; FRANK D. WHITWORTH, VADM, Director, National Geospatial-Intelligence Agency,

        Defendants – Appellees.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony John Trenga, Senior District Judge. (1:23-cv-01149-AJT-LRV)

_____

Argued:  December 10, 2025              Decided:  March 11, 2026

_____

Before RUSHING and HEYTENS, Circuit Judges, and FLOYD, Senior Circuit Judge.

_____

Affirmed in part, vacated in part, and remanded by unpublished opinion. Judge Heytens wrote the opinion, which Judge Floyd joined. Judge Rushing wrote an opinion concurring in part and dissenting in part.

_____

**ARGUED:** Andrew O. Clarke, DISTRICT LEGAL GROUP, PLLC, National Harbor, Maryland, for Appellant. Peter B. Baumhart, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellees. **ON BRIEF:** Erik S. Siebert, United States Attorney, Carolyn M. Wesnousky, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit.

TOBY HEYTENS, Circuit Judge:

Plaintiff Terrance Reeves brought three claims against his employer arising from his negative performance review and termination. The district court dismissed one claim and granted summary judgment to the defendants on the other two claims. We affirm in part and vacate in part.

*        *        *

The district court correctly dismissed Reeves' race discrimination claim (Count 1) for failure to state a claim. To survive a motion to dismiss, the complaint needed to plausibly allege that the employer took some adverse employment action "*because of*" Reeves' race. 42 U.S.C. § 2000e-2(a) (emphasis added). We agree with the district court that the complaint failed to do so.

*        *        *

The district court also correctly granted summary judgment to the defendants on Reeves' hostile work environment claim (Count 2). To succeed on that claim, Reeves needed to prove (as relevant here) that (1) he "experience[d] unwelcome harassment" that was (2) "because of . . . [his] race" and (3) "so severe or pervasive that it alter[ed] the conditions of [his] employment and create[d] an abusive atmosphere." *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 781 (4th Cir. 2023) (quotation marks removed). The latter two requirements are judged by an "objective" "reasonable person" standard. *Id.* at 781–82 (quotation marks removed).

Even resolving all disputed issues of material fact in Reeves' favor, we conclude the facts here do not satisfy the relevant legal standards and that the defendants are thus

3

"entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For example, Reeves testified about an incident in which a supervisor showed him a picture of an AR-15 rifle the supervisor had just purchased. But Reeves also testified he believed the supervisor "was not motivated by race" in doing so, JA 149, and we see no reason to second-guess the plaintiff's own opinion. We also conclude that the other incidents described in the summary judgment record—regrettable and inappropriate as some of them may be—are insufficient to create the sort of "*severe or pervasive* hostile work environment" required by this Court's precedent. *Robinson*, 70 F.4th at 783.

*      *      *

In contrast, we conclude the district court erred in granting summary judgment to the defendants on Reeves' retaliation claim (Count 3). To defeat the defendants' motion, Reeves needed to raise a genuine dispute of material fact about whether the defendants discriminated against him "*because* he . . . opposed" "an unlawful employment practice" or "made a charge, testified, assisted, or participated in any manner in an investigation . . . under" the relevant statute. 42 U.S.C. § 2000e-3(a) (emphasis added); see Fed. R. Civ. P. 56(a).[1] We conclude Reeves did so.

---

[1] Although Section 2000e-3(a) does not, by its own terms, apply to federal employers like the defendants, a federal-sector provision of Title VII permits courts to remedy "violation[s] of section 2000e-3(a)." 42 U.S.C. § 2000e-5(g)(2)(A). This Court has held that provision "incorporate[s]" Section 2000e-3(a)'s "anti-retaliation provision's protections," *Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022), and the defendants have not challenged that understanding.

4

True, the defendants "asserted a legitimate, nonretaliatory reason for any adverse employment actions taken against Reeves"—specifically, a well-documented history of poor job performance predating any protected activity, to which employees whom Reeves did not accuse of retaliation attested. JA 1026. But unlike the district court, we conclude the summary judgment record contains evidence that could—if credited by the factfinder—support a finding of unlawful retaliation.

In July 2019—a few weeks after he was hired—Reeves met with two supervisors to discuss his role. Reeves testified that, during this meeting, the supervisors told him one of his predecessors had filed an EEO complaint against them. Reeves testified that the supervisors further told him that "if [he] had any intentions on going through a EEO case with them[,] that [he] was on a two-year probation and that they will fire [him], and [his] pretty government career will be over." JA 141; accord JA 397 (describing one of the supervisors as saying they had "learned from" the previous EEO process and that "we will get rid of you before we go down that road again").

Less than a year later, Reeves contacted his agency's anti-harassment hotline to complain about the same two supervisors' conduct. Both supervisors learned about the allegations in July 2020. One supervisor admitted to having "assumed Mr. Reeves had made" them, JA 226, and the other described having an "in-person meeting" that same month that "included discussion about *Mr. Reeves'* allegations," JA 260 (emphasis added).

Reeves filed an anonymous informal EEO complaint against the same two supervisors on August 7, 2020. Both supervisors learned about the informal complaint several weeks later, and one of them (Reeves' direct boss) admitted that he "surmise[d] . . .

5

that Mr. Reeves may have been the Complainant." JA 226. On October 5, 2020, Reeves filed a formal EEO complaint, again naming the same two supervisors. Three days later, Reeves received an overall performance rating of "Unacceptable" on a form that listed one of the supervisors as the "rater" and the other supervisor as the "reviewer." JA 544. Reeves was fired just over three months later.

We conclude the facts recounted above could—if believed—support an unlawful retaliation finding. To be sure, just because one thing happened after another does not prove the earlier event caused the later one. That is why closeness in time alone is often (though not always) insufficient to raise a triable issue of fact about whether a later adverse employment action was motivated by earlier protected activity. See, *e.g.*, *Hall Haggins v. Wilson Air Cntr., LLC*, 163 F.4th 872, 881 (4th Cir. 2026). But here there is more: Reeves testified that his supervisors *told him* he would be fired if he ever filed an EEO complaint against them, and the undisputed evidence shows that is what happened. Of course, the factfinder might credit the supervisors' assertions that they said no such thing, or conclude that the ultimate decision to fire Reeves was made by other people or for other reasons. But it is not a court's job when reviewing a summary judgment motion "to determine what really happened or figure out whose version of events is more likely to be true." *Alexander v. Connor*, 105 F.4th 174, 179 (4th Cir. 2024). And Reeves' testimony on this point— especially when coupled with his direct supervisor's admission that he knew Reeves had filed an informal EEO complaint before submitting the negative performance review—is

6

certainly *some* "evidence" "upon which pretext can be reasonably inferred." JA 1028.[2] For

that reason, we conclude the district court erred in granting summary judgment to the

defendants on Reeves' retaliation claim.

*      *      *

The judgment is affirmed in part and vacated in part, and the case is remanded for

further proceedings consistent with this opinion.

*SO ORDERED*

---

[2] Both supervisors submitted declarations claiming they only learned that Reeves "filed a formal EEO Complaint" months after they submitted their negative performance evaluation. JA 419, 422. Neither declaration, however, says anything about when the supervisors learned Reeves had called the anti-harassment hotline or submitted an informal complaint. See Defs.' Br. 24 (acknowledging that Reeves' contacting the hotline was "protected activity").

RUSHING, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the district court correctly dismissed Reeves's discrimination claim and correctly granted summary judgment to the defendants on Reeves's hostile work environment claim. But unlike the majority, I would also affirm summary judgment in the defendants' favor on Reeves's retaliation claim. No reasonable jury could find that the defendants' asserted reason for Reeves's negative performance evaluation and termination—namely, his well-documented history of poor work performance, which predated his protected activities and persisted throughout his employment—was a pretext for retaliation. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250, 252 (4th Cir. 2015) (applying *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Accordingly, I would affirm in full.

Shortly after Reeves began his probationary employment at the National Geospatial-Intelligence Agency in July 2019, his supervisors, Gondeck and Cichetti, grew concerned about his performance. In September, Gondeck contacted the human resources department for advice about how to address Reeves's continuing performance problems. On October 10, Gondeck and Cichetti met with Reeves to discuss their concerns. They explained that his work product was "neither timely nor of requisite quality." J.A. 334. Reeves's team members felt "as though [Reeves did] not respect their experiences or opinions" and that he had "been dismissive or condescending towards them." J.A. 334. And his conduct was "adversely affecting both substantive production and morale." J.A. 334. His supervisors specifically noted that Reeves was not on track to meet his performance objectives and cautioned that they "need[ed] to see immediate significant improvement in the timeliness

8

and quality of the work product and the manner in which [he] engage[d] with [his] teammates." J.A. 335. They explained that they would "take a more direct role in the day-to-day taskings" of Reeves's division, asked him to attend training and coaching, and provided him with specific guidance on improving his performance. J.A. 336.

On October 21, Gondeck and Cichetti held a follow-up discussion with Reeves and provided additional examples of his performance deficiencies. They also informed Reeves they would initiate an Ombudsman Facilitated Self-Assessment of his division and its workplace culture. Gondeck and Cichetti met with Reeves again on November 15 to continue providing feedback and guidance about objectives he "was still not performing successfully." J.A. 314. Among other things, they expressed concern about his continuing lack of subject-matter expertise and the "virtually daily" complaints they received from employees and contractors about his "engagement and communication style." J.A. 315.

Gondeck and Cichetti received the Ombudsman's report on November 22. Comments from division personnel in the report "confirm[ed] what [Gondeck and Cichetti] were hearing and seeing" regarding the seriousness of Reeves's performance and behavior problems. J.A. 243; *see* J.A. 318–319. Through January and February 2020, members of Reeves's team continued raising concerns to Gondeck and Cichetti about his leadership, management style, and lack of subject-matter expertise. And as of February 2020, Reeves continued to have "performance issues on a daily to multiple per week" basis. J.A. 381.

In April 2020, Gondeck and Cichetti submitted an extensive formal memorandum documenting Reeves's "unacceptable performance and behavior" and recommending his "removal during [his] trial period." J.A. 303, 305. This 27-page memorandum chronicled

9

Reeves's troubled tenure, including twelve specific scenarios and their impact on the agency. Reeves's supervisors concluded that he "regularly demonstrates poor decision quality, lacks the ability to think critically, refuses to accept responsibility for his work or that of his subordinates, fails to deliver quality work product in accordance with deadlines, . . . routinely conducts himself in a manner inconsistent with [the agency's] [v]alues, . . . demonstrate[s] complete disregard for . . . feedback and constructive direction," and treats the personnel in his division in an "unwarranted, unprovoked, toxic, and degrading" manner. J.A. 330.

That was all *before* Reeves engaged in the protected activity on which he bases his retaliation claim. In May and June of 2020, Reeves complained to human resources that Gondeck and Cichetti allegedly harassed and discriminated against him, and they became aware of his complaints in July 2020. Reeves alleges that the following two events occurred in retaliation for his protected activity.

In October 2020, Reeves received his performance evaluation for the year ending September 30, 2020, in which Gondeck rated Reeves's overall performance as a "1.0" on a scale of 1 to 5—an "[u]nacceptable" rating. J.A. 532. After three phases of agency reconsideration, Reeves's overall rating remained unchanged. In December 2020, the Personnel Evaluation Board met to discuss Reeves's situation and recommended he be removed. After reviewing the documentation, including "examples provided by management about [Reeves's] failure to meet expectations," the director of human resources decided that Reeves's "poor performance . . . warranted removal during the trial

10

period." J.A. 512. On January 15, 2021, the director issued a letter informing Reeves that his employment would be terminated effective January 29, 2021.

Despite the undisputed evidence of Reeves's poor performance predating his protected activity, the majority believes a reasonable jury could find Reeves received an "unacceptable" rating and was terminated, not because of his deficient performance as the defendants claim, but in retaliation for his protected activity. The majority bases this conclusion on Reeves's assertion that, in July 2019 when he began his job, Gondeck and Cichetti told him he would be fired if he brought "an EEO case." J.A. 141.

On these facts, that alleged comment makes no difference. For a full year before Gondeck and Cichetti became aware of Reeves's EEO allegations, they had received constant complaints from Reeves's colleagues and had consistently documented his unacceptable performance. And three months before they were aware of his allegations, Gondeck and Cichetti recommended that Reeves be terminated. Even viewing the evidence in the light most favorable to Reeves, the actions that led to his negative evaluation and termination "began *before* [his] protected activity, belying the conclusion that a reasonable factfinder might find that [those decisions were] motivated by [Reeves's] complaints." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006); *see also Barnhill v. Bondi*, 138 F.4th 123, 133 (4th Cir. 2025). I would therefore affirm the district court's decision in full.

11